*756 OPINION OF THE COURT
Stanley Gartenstein, J.
The on-again off-again debate over prostitution and its impact on the criminal justice system returns for reconsideration in the light of a new statute and response thereto by the office of the District Attorney.
BACKGROUND
Prior to September 1, 1978, the moral sanction of society with regard to sex offenders as expressed in the Penal Law was discriminatory. A woman engaged in prostitution was guilty of a class B misdemeanor (Penal Law, § 230.00) while her male patron was guilty only of a violation (§ 230.03). Under the amended statute, the patron or so-called "John” is now also guilty of a class B misdemeanor. Because prostitution has traditionally been a blight upon important commercial and tourist areas, a problem unique to New York County, the People have steadfastly refused to plea bargain, insisting instead on a plea to the top charge. The one notable exception to this policy, the first-offender prostitute, was traditionally offered an adjournment in contemplation of dismissal in the hope that her experience would have the beneficial effect of deterring her from further similar acts.
With the advent of the new statute raising the level of culpability of the patron, the District Attorney matched his policy of insisting on a plea to the charge by the prostitute with similar insistence as to the "John”. As a corollary, a determination was made not to offer adjournments in contemplation of dismissal to the first-offender patron. This in turn in the name of equality of enforcement against each sex, triggered a reversal of the traditional policy of adjournments in contemplation of dismissal for first-offender prostitutes. Thus, escalated enforcement against the "John” to avoid discriminatory enforcement against the prostitute has now resulted in escalated prosecution of the prostitute in a manner impacting more harshly upon her than upon the patron. This result is occasioned by the fact that a prostitute who is no longer offered a second chance via an adjournment in contemplation of dismissal has infinitely more to lose by being sent out on the streets to earn her fine by selling her body again than the patron who is usually more affluent, often a substantial busi *757 nessman away from home who can pay his fine and forget about the experience.
THE FACTS
In the separate dockets before us, each defendant is a young woman charged with prostitution who has been arrested for the first time. Audrey James is 21 years old presently attending the American Business Institute majoring in business administration. She was the recipient of a basic educational opportunity grant and is an active member of the institute’s student liaison group dealing with student problems. Laverne McCray is 23 years old, attending business school and resides with her parents in Queens County. She has returned to school in an effort to better herself after some years away from any academic pursuits. Each defendant has moved for dismissal in the interests of justice pursuant to CPL 170.30 and 170.40. These motions have been vigorously opposed by the District Attorney who argues that this relief is being sought in an effort to overrule the People’s determination not to adjourn in contemplation of dismissal.
DISMISSAL IN THE INTERESTS OF JUSTICE
Under CPL 170.40 and 210.40 (subd 1) a court may dismiss an accusatory instrument where: "[S]uch dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such accusatory instrument or count would constitute or result in injustice.” (CPL 210.40, subd 1; emphasis supplied.)
The recent flurry of cases on dismissal in the interests of justice has created the somewhat erroneous impression that we encounter here a relatively new field of law. This notion may be put to rest by reference to the comprehensive opinion of Honorable Nathan R. Sobel which discussed the predecessor statute to the one now under consideration in People v Quill (11 Misc 2d 512, 513), in which he states:
“It is settled that sole discretion to dismiss an indictment in the interest of justice is vested in the court. The District Attorney may join in such an application but his consent is not necessary. A study of the history of section 671 will make clear why it was decided to vest such discretion in the court and not in the District Attorney. (See Report of Comrs. on *758 Pleading and Prac. — Code Crim. Pro., dated Dec. 31, 1849, p. 343; People v. McLeod, 25 Wend. 483.)
"Section 671 is a statutory enactment of the former power of nolle prosequi. The power to discontinue prosecution of a crime vested by that section in the court has little or nothing to do with the legal or factual merits of the charge. Nor is it concerned with the guilt or innocence of the defendant. Such a dismissal, is concerned, as the statute states, solely with principles of justice. (See State v. McDonald, 10 Okla. Cr. 413.)”
The District Attorney points out in opposition to the motion that CPL 170.40 and 210.40, the current counterparts of this remedy tracing its roots back as far as 1849, provide for an extraordinary remedy when compelling facts or circumstances are present and warrant the use thereof. These sections are "not a catch-all residuary clause authorizing dismissal as an exercise of absolute discretion” (citing People v Edwin C., 82 Misc 2d 245, 246; People v Clayton, 41 AD2d 204).
He further argues that a dismissal in the interests of justice is predicated upon a " 'sensitive balancing’ of the interests of the individual and those of the State” (People v Kwok Ming Chan, 45 AD2d 613, 616) and stresses that even in the early stages of this doctrine under section 671 of the Code of Criminal Procedure case law emphasized its use only in extraordinary situations. " 'The purpose of section 671 [Code Crim Pro] is to give a court power in appropriate but rare circumstances to allow the letter of the law gracefully and charitably to succumb to the spirit of justice.’ ” (People v Davis, 55 Misc 656, 659, in People v Shanis, 84 Misc 2d 690, 694; emphasis added.)
Finally he quotes People v Stern (83 Misc 2d 935, 940) in which the Honorable Howard Goldfluss remarked: "It is the opinion of this court that the Legislature used the word 'compelling’ as a means to put the judiciary on notice to use this section as sparingly as garlic.”
The landmark adjudication in People v Clayton (supra), decided in 1973 (App Div, 2d Dept), has been considered as seminal on the issues surrounding this remedy to an extent where the application itself has become known as a "Clayton ” motion. It has been cited with approval by the Court of Appeals (People v Beige, 41 NY2d 60) and by the First Department (People v Kwok Ming Chan, 45 AD2d 613, supra). It is noteworthy that the Appellate Division in Clayton (41 *759 AD2d 204, 206, supra) subscribes to Judge Sobel’s description of the historical roots of this remedy and cites People v Quill (11 Misc 2d 512, supra) with approval.[1]
The greatest significance of Clayton may be found in the Appellate Division’s listing of those factors which a court must consider in deciding a motion under this section (p 208). These are: (a) The nature of the crime; (b) Available evidence of guilt; (c) Prior record of defendant; (d) Punishment already suffered; (e) Purpose and effect of further punishment; (f) Prejudice resulting to defendant by passage of time; (g) Impact on public interest of dismissal.
Before considering these factors, it is relevant to discuss the attitude of our highest court with regard to their application. In People v Beige (supra), the Court of Appeals reviewed a dismissal in the interests of justice and concluded that review could not be had therein inasmuch as its jurisdiction was limited by article VI (§ 3, subd a) of the New York State Constitution to questions of law. This area was effectively foreclosed when an exercise of discretion by the court of original jurisdiction was at stake unless the alleged abuse thereof was so pronounced as to constitute a reviewable question of law. Holding itself without power to review, the Court of Appeals expressed "discomfiture with CPL 210.40 [170.40] in its present form * * * [t]o the extent that the section now fails to prescribe criteria for the responsible exercise of the discretion granted by the section and fails to require the court to articulate the manner and extent to which the particular case meets such criteria” (People v Beige, supra, p 62). While the Court of Appeals delineated Clayton’s *760 approach as "commendable”, it expressed the view that "the issue involves policy of a dimension more appropriate for legislative resolution” (p 62). In a concurring opinion, Judge Fuchsberg disagreed with the need for specific criteria, holding that same would "undermine the flexibility called for to meet the needs of the very cases in which freedom to exercise discretion is most urgently required” (p 63).
Following Beige and directly responding to its call for legislation, the Advisory Committee on Criminal Law and Procedure of the Judicial Conference and Office of Court Administration in its Seventh Annual Report (Jan., 1978), drafted an amendment to CPL 170.40 and 210.40 codifying Clayton’s criteria (Twenty-third Ann Rep, Admin Bd of Judicial Conference, 1978, p 307). The proposed statute was submitted to two recent sessions of the Legislature and failed to pass, thus giving at least some basis for belief that the Legislature intended to ratify Judge Fuchsberg’s argument centering around the need for flexibility of the court’s discretion. Whether or not this was its effect is problematic. Obviously the Legislature cannot manifest a desire to overrule the Court of Appeals by a simple failure to act.
Whether or not consideration of Clayton’s criteria is legally mandated, we would be hard-put to find a better basis on which to rest judicial discretion. We proceed, therefore, to consideration thereof in seriatim.
(a) The nature of the crime: Prostitution is a victimless crime in which two equal contracting parties negotiate for the performance of an act proscribed by law, usually performed in private by consenting adults. The failure of law enforcement officials to stem its tide is now being recognized to an extent where the latest thinking supports the establishment of specially zoned areas in which same would be permitted (cf. Special Committee on Criminal Justice, Assn of the Bar of the City of NY, Discussion Paper No. 5, Jan., 1979). Experience with its proliferation may be compared to prohibition, viz., involving an act prohibited by law which morality of the marketplace failed to recognize as particularly heinous and concerning which the almost universal disregard of its illegality ultimately resulted in repeal to the jubilation of millions and relief of law enforcement personnel. An object lesson that morality cannot be legislated might properly be coupled with a realization that the real victim of prostitution is the prostitute herself and the real criminal, her pimp, who keeps her *761 virtually enslaved by threats of cutting her up and by fostering ignorance of the fact that she can make it in life without him. Our system of law enforcement has as yet found no effective way of bringing these pimps to justice. Might it not be more productive to focus society’s efforts on the parasite rather than the host?
(b) Available evidence of guilt: No comment is made on this factor; we presume arguendo a provable case.
(c) Prior record of defendant: Neither defendant has ever been arrested or convicted of this or any other crime.
(d) Punishment already suffered: Each of these defendants has been arrested and spent at least some time incarcerated awaiting arraignment. The court considers this enough punishment to satisfy this element of Clayton. We feel it in order, however, to comment that in assessing punishment already suffered by each defendant, we refuse to pontificate that she lacks sensitivity sufficient to perceive that this act with which she is charged is self-destructive and degrading to her. To refuse each defendant the dignity of recognizing that the act itself — or rather, the need to resort to it — is punishment in a measure no court could exact, is to strip away her humanity and categorize her with legally fungible goods. We have yet to reach that state of sophistication in which we might be capable of this.
(e) Purpose and effect of further punishment: Traditionally, prostitution has been punished by assessment of a fine with alternative jail time for nonpayment. If a prostitute is beholden to a pimp, his supplying funds to this fine will further obligate her to him by the rules óf the jungle in which they function. If she works alone, the net effect of this punishment is to send her back to the streets to earn these funds by again selling her body. In recognizing this fact, we simply give effect to the very same reasoning utilized by the District Attorney in adjourning first arrest prostitution cases in contemplation of dismissal prior to the new statute. We fail to comprehend the District Attorney’s argument that in drawing the line precisely where he himself had previously chosen to draw it, we are abusing our discretion. Understandably a line must be drawn somewhere. This reasoning, like all arguments, can be applied reductio ad absurdum to every arrest to support a contention that we should not send a prostitute out for the 50th time to pay the fine for her 49th arrest. That line has traditionally been drawn at the first offense. We see no reason *762 to depart from it. The concept of one permissable mistake is built into almost every phase of the criminal law. That we are disappointed more often than not should be no deterrent to efforts to save the single individual before us.
(f) Prejudice to defendant by passage of time: This factor is irrelevant in this context and not considered here.
(g) Impact on public interest of dismissal: Whatever function one assigns to our system of justice on a philosophical basis, there can be no argument that protection of the public interest ranks among society’s priorities. In dollar-for-dollar terms "[t]he criminal justice system in New York City is big business. It costs over a billion dollars a year to run; over $879 million for police; $120 million for corrections; $114 million for courts and judges; $37 million for District Attorneys; $19 million for probation; and $19 million for legal aid” (Special Committee on Criminal Justice, Assn of the Bar of City of NY, Discussion Paper No. 5, Jan., 1979). Presumably, an expenditure of taxpayer dollars of such magnitude should generate the maximum in dollar-for-dollar efficiency. Nevertheless, "Among the areas where less use of valuable criminal justice resources seems clearly indicated are the arrest and prosecution of petty gamblers and prostitutes. These two areas of criminal prosecution are plainly anachronistic in today’s social climate. Both account for a substantial volume of the arrests which presently utilize signiñcant police resources (particularly in New York County) without any perceptible beneñts.” (Discussion Paper No. 5.) In statistical terms, "Prosecuting gambling and prostitution cases costs the city another $9 million per year. Those anachronisms of modern penology, revolving-door criminal prosecution of streetwalkers and bookmakers, which are concededly ineffective, run up a substantial annual cost to the city taxpayers while helping to clog the court system. The study reveals that it costs between $239.31 and $898.28 to process a prostitution arrest through the Criminal Court and between $239.31 and $789.21 to process a gambling case. The average cost for processing a prostitution case through the courts is $505.11; for processing a gambling case it is $625.78. Applying weighted time-cost study figures to the city-wide dispositions of weighted 1977 Criminal Court cases produces these total cost figures:
*763 Prostitution (14,098) Gambling (2,842) $7,121,040 1,778,466 $8,899,506
(Special Committee, Discussion Paper No. 4, Dec., 1978.)
The report (Discussion Paper No. 4) further points out that, compared to the average cost of a prostitution case of $505.11, the average kidnapping case costs $464.37; the average robbery $470.49. At a time of public outcry about the inability of our system of justice to deal effectively with violent crime, we are still wasting valuable court time and taxpayer funds on a victimless crime, the existence of which as a fact of human nature was recognized without particular disapproval as far back as Genesis 38:15. This in face of the fact that, "The Criminal Court of the City of New York staggers under an enormous caseload. Virtually every arrest made in the city must pass through the Criminal Court’s doors — 235,761 case filings during 1977. An average of almost 650 cases a day, Sundays and holidays included.” (Discussion Paper No. 4.)
We conclude that the public interest is not served by intransigence on an issue whose irrelevance to the real problem of violent crime is recognized almost universally. "A court must intervene boldy when unfairness * * * surfaces in a particular case. The purpose of CPL 210.40 [and 170.40] is to interpose the court between the prosecution and the accused in an appropriate case. * * * An independent judiciary must never fear the risk of retribution or the dismay of traditionalists when it makes a decision or issues an opinion that it believes is right” (People v Collier, 85 Misc 2d 529, 566). Ultimately an application in the interests of justice represents an appeal to one Judge’s individual conscience. We cannot find it within ourselves to reject our own moral belief that ultimate protection of society is best achieved where at all possible by total rehabilitation of the one human being standing before us whose very presence calls out that he or she is human, unique and worth at least some effort — and faith — on our part.[2]
Motions granted. Proceedings dismissed in the interests of justice.

. It is appropriate to note in passing that the classic argument usually advanced in opposition to applications for dismissal in the interests of justice in which real or purported prosecutorial intransigence is at stake is that this remedy cannot properly be invoked to overrule a prosecutor’s discretion in refusing consent to an adjournment in contemplation of dismissal. The adjudication herein • is based upon the particular facts before us and not as a response to purported intransigence. Nevertheless, were the reverse true, we are not convinced of the validity of this argument in the face of Judge Sobel’s erudite opinion, cited with approval by Clayton itself, which traces the roots of CPL 170.40 and its predecessor statutes back to the power of nolle prosequi. This power was traditionally reserved exclusively to the prosecutor, and forms at least part of the foundation of the present day discretion in consenting to adjournments in contemplation of dismissal. It cannot be disputed that the court’s power to dismiss in the interests of justice is directly rooted in a legislative intent dating from the 1849 report to transfer this power to the court to act where the District Attorney does not. As with so many other insights, we are grateful to Judge Sobel’s exhaustive research for putting this myth to rest.

. We have studied and indorse the enlightened opinion of our colleague, the Honorable Alain M. Bourgeois who has held dismissal in the interests of justice appropriate in a series of patronizing cases (People v Buceo).