OPINION OF THE COURT
Ascher Katz, J.
By two separate motions, each defendant moves to dismiss the informations in the interest of justice pursuant to *1076 CPL 170.40. The motions were preliminarily granted to the extent of directing a Clayton hearing (People v Clayton, 41 AD2d 204).
On February 24,1978 at about 4:30 p.m., defendants were apprehended by members of the New York State Police while committing an act of fellatio in the public men’s room at the Ardsley service area on the New York State Thru way in Greenburgh, New York.
The information complaint charged the defendants with committing the misdemeanors of consensual sodomy (Penal Law, § 130.38), public lewdness (Penal Law, § 245.00), and loitering for the purpose of deviate sex (Penal Law, § 240.35, subd 3). Defendant Joseph P. was also charged with unlawful possession of marihuana (Penal Law, § 221.05), a violation. Prior motions attacking the constitutionality of the alleged illegal search and seizure have been denied by the undersigned.
The motion to dismiss in the interest of justice is mandated only by the existence of some compelling factor, consideration, or circumstance clearly demonstrating that conviction or prosecution of the defendant would constitute or would result in an injustice (CPL 170.40). The purpose of the statute is to give the court power “in appropriate but rare circumstances to allow the letter of the law gracefully and charitably to succumb to the spirit of justice” (People v Davis, 55 Misc 2d 656, 659). An order for dismissal in the interests of justice has little or nothing to do with the legal or factual merits of the charge or with the guilt or innocence of the defendant; the court is solely concerned with the principles of justice. (People v Quill, 11 Misc 2d 512.)
The criminal procedure process has over 35 provisions for determinations to be made in the interests of justice. (See People v Williams, 97 Misc 2d 24, 31, 32.) The dismissal in the interest of justice has a special status different from the other determinations in the interest of justice. That special status was recognized in People v Clayton (41 AD2d 204, supra) which required a full hearing on the issue to insure procedural safeguards and fact finding on the record necessary for the integrity of the criminal justice system. The *1077 First Department followed on the requirements of a hearing in People v Kwok Ming Chang (45 AD2d 613).
People v Clayton (supra) was approved in People v Belge (41 NY2d 60, 62) where the Court of Appeals pointed to the necessity for legislation to safeguard against misuse or abuse of authority in criminal courts of first instance: “Most important, the history of criminal procedure in this State has been to add safeguards against misuse or abuse of authority in criminal courts of first instance. Those safeguards, experience has demonstrated, are most effective if there be appellate review, possible only if there are standards. Justice for victim and defendant merits no less. We invite the attention of the Legislature to this predicament.”
In 1979, the Legislature amended CPL 170.40, CPL 210.40 and related provisions to require the court to specifically inquire into 10 enumerated factors. The Supplementary Practice Commentaries for CPL 210.40 state: “This amendment is the product of a thorough and innovative search for the broadest and most useful and most appropriate determinants for a judge to apply in terminating a criminal prosecution, often and perhaps against a prosecutor’s opposition, for other than a technically legally sufficient reason. These determinations evoke the true and unfortunately perceived of as old-fashioned, sometimes courageous ‘judging’. It is the spirit of the law that is alive in this section, rather than the mere letter. On the other hand, what must be guarded against, and this amendment helps, is arbitrary or even perhaps corrupt terminations of prosecution; the amendment helps by compelling judges to consider and articulate real reasons and by making that'adjudication and the articulated reasons reviewable, presumably against a record supporting the reasons. Thus, in the appellate process not only the exercise of the discretionary particulars but even possible abuse of discretion in so acting, usually a law question, can be examined and corrected.” (Bellacosa, 1979 Supplementary Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 210.40, 1972-1979 Supplementary Pamphlet, p 188; emphasis supplied.)
The amendment’s effective date was January 1,1980. There is no express provision as to retroactivity. Since the *1078 criteria under the legislation are more detailed than those of People v Clayton (41 AD2d 204, supra), this court will examine the 10 criteria ([a] through [j]) under the 1979 amendment.
(a) The seriousness and circumstances of the offense. The evidence shows that an act of fellatio was committed in a public restroom. This court takes judicial notice that prior to the instant arrests, numerous complaints of homosexual activity at the Ardsley service area were made. The police must be commended in removing what a significant portion of the community deems to be offensive activity and which the Legislature has declared to be illegal.
(b) The extent of harm caused by the offense. The offense was a victimless crime, both participants being consenting adults. However, it is obvious that there are people who are offended by overt sexual display in a public place, be it homosexual or heterosexual.
(c) The evidence of guilt whether admissible or inadmissible at trial. The evidence of guilt of a misdemeanor appears clear. Both officers testified to the events. Neither defendant denied his presence at the time and place of the alleged occurrence. There was no proof of the marihuana charge.
(d) The history, character and condition of the defendant. Defendant Joseph P. is a public school teacher without any prior criminal history who appeared to be an intelligent and extremely sensitive individual on the witness stand. Donald B. isa bonded employee of a large company also without any prior criminal history. There is no showing that their vocational activities were involved or affected.
(e) Any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant. Joseph P. stated that he was forcibly seized and handcuffed with his hands behind his back. His foot was kicked to the side when he was told to spread his legs. During the checking of his car, he stated that a police officer ripped up the rug and this allegation is not denied. He was stripped and searched by one trooper in a large open room in the State Police barracks and held naked in that room for some period of time. Another trooper walked in stating “Too *1079 bad an Italian had to be a faggot”. Joseph P. was handcuffed to his chair. Upon inquiry, the trooper could cite no rule or regulation requiring the strip search. While there does not appear to be that type of misconduct which would give rise to a violation of due process (see People v Isaacson, 44 NY2d 511), such police misconduct is a significant factor in the court’s determination herein. The defendants’ wrongs give no license to the police to become gratuitously foul. Police are professionals, should be treated as such, and should act accordingly.
(f) The purpose and effect of imposing upon the defendant a sentence authorized by the offense. The defendants claim that the totality of the proceeding to date has involved sufficient punishment. Defendants have been fingerprinted and photographed. They have been deprived of their freedom of movement in custody for some hours. In Judicature, it was stated: “Political scientist Malcom Feeley has suggested that lawyers may be inappropriate for misdemeanors where prison is not a realistic possibility. In these cases, the process itself is the punishment. The defendant wants to get in and out of court as soon as possible. But he must suffer bail, attorneys’ fees, adjournments to get an attorney, time for an attorney to make motions, and so forth. After all that, paying a fifty dollar fine is certainly anticlimactic.” (Nejelski, Do Minor Disputes Deserve Second-Class Justice?, 61 Judicature 102; emphasis supplied.)
The People have offered the defendants adjournments in contemplation of dismissal (ACD’s) (albeit upon condition that they waive return of their fingerprints and photographs under CPL 160.50 which will be discussed below). Even if the defendants were found guilty, the court would be hard put to impose any penalty other than an unconditional discharge.
While the offer of the ACD would be inadmissible in any trial, the court may consider the fact of said offer at a Clayton hearing. (People v Vernon, 89 Misc 2d 472 [polygraph test results relevant at Clayton hearing].) Compare People v James (98 Misc 2d 755) where the court notes the refusal of the People to offer an ACD (dismissal in the interest of justice granted).
*1080 (g) The impact of a dismissal upon the confidence of the public in the criminal justice system. Were the public to know all the facts and circumstances involved herein, the court feels assured that the public’s confidence in the criminal justice system would be enhanced.
(h) The impact of a dismissal on the safety and welfare of the community. There will be little, if any, impact on the safety and welfare of the community. Further, because of the manner in which the court will frame its order herein, there will be reasonable safety for the community without any concomitant violation of the rights of the defendants.
(i) Where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion. This aspect is moot since the crime itself is victimless, both adult defendants are making the same motion to dismiss.
(j) Any other relevant fact indicating that a judgment of conviction would serve no useful purpose. A xeroxed form for the application for the adjournment in contemplation of dismissal has been prepared by the office of the District Attorney. Part I, labeled “To be completed prior to granting of ACD” contains the following provisions: “5. (b) I waive all provisions of §160.50 of the Criminal Procedure Law including the return of any fingerprints and the sealing of any records”.
Were the defendants not to sign such a waiver, and if the instant application be denied, the matter would proceed to trial, the defendants might be convicted, and in such event, defendants will probably receive an unconditional discharge. Frankly, such a course would appear to involve an unwarranted expenditure of the public’s time, effort and resources and a judgment of conviction would serve no useful purpose. The District Attorney’s office has indicated its own attitude by the offer of the ACD where a dismissal would normally follow as a matter of course. In offering the ACD, the District Attorney has imposed what I find to be an unlawful condition and has made an unwarranted intrusion into the prerogatives of the judiciary and has attempted a perversion of the statutory scheme expressed by CPL 160.50 as amended, CPL 160.60 and new CPL 160.55.
*1081 According to the records of the Greenburgh Town Court, from September 1,1976 (the effective date of CPL 160.50) to September 30, 1980, approximately 227 misdemeanor charges have been disposed of pursuant to CPL 170.55 by the court’s granting of ACD’s with the consent of the People. In each and every instance, with only one exception that I am personally aware of, the People have extracted the waiver of CPL 160.50 provisions for the return of fingerprints and photographs. The one exception dealt with a minor petit larcency charge against a sixtyish looking, genteel, Caucasian, white-haired lady, excrutiatingly embarrassed, who appeared for arraignment late one Friday afternoon in the presence of a young Assistant District Attorney.
At the first two applications for an ACD containing the waiver of the CPL 160.50 provision, the defense attorneys objected to the conditions and I refused to grant the ACD’s upon such conditions. The Greenburgh Town Court is enormously busy, the largest Town Court in Westchester County. Greenburgh is probably the fourth largest town in New York State and one of the largest jurisdictions with part-time Judges in the State. Greenburgh has 95,000 people and includes six incorporated villages, viz., Hastings, Dobbs Ferry, Irvington, Tarrytown, Elmsford, and Ardsley. It is criss-crossed by four major arteries: 1-287, Cross-Westchester Expressway; 1-87, New York State Thruway; the Sprain Brook Parkway; and the Bronx River Parkway. Greenburgh Police, New York State Police, and the Westchester County Police operate within its jurisdiction. The workload of the court at times is enormous. The attorneys who had objected to the conditions on the first two ACD’s had been appearing regularly in the Greenburgh Town Court. On a subsequent date, they indicated, off the record, in chambers, that as a practical matter, they had to go along with the conditions of the ACD’s. The cases were minor and of the traditional types that usually resulted in ACD’s with first time entrants into the criminal justice system. Although I found the waivers personally obnoxious, I thought I should not impose my personal values upon the parties in view of the defense counsel’s acquiescence in and the prosecution’s insistence upon the waiver of CPL 160.50. The 226 waivers followed during the next four years.
*1082 The court may, on motion of the People or defendant and the consent of the other party, or on the court’s own motion and consent of the other parties, order that the action be adjourned in contemplation of dismissal. (CPL 170.55.) The consent of the defendant is rarely withheld. The issue is whether or not the People’s consent to the ACD is unfettered and unbounded and can be withheld or granted no matter how irrationally, arbitrarily, corruptly or illegally exercised. It is clear that, as a general rule, the People’s consent is required. (People v Stern, 83 Misc 2d 935.) While there is dictum that a court lacks the authority in a traffic infraction to deny the prosecutor’s request for an adjournment in contemplation of dismissal (People v Ruggieri, 100 Misc 2d 585; cf. People v Glaubman, 68 Misc 2d 698), it would appear that the sounder approach is that a court always has the independent discretion to grant or deny an application for an ACD.
The power and duty to prosecute crimes rest by statute with the District Attorney. (See Matter of McDonald v Sobel, 272 App Div 455,460.) And while the District Attorney is a quasi-judicial officer (see, e.g., People v Kyser, 52 AD2d 1072; People v Causer, 43 AD2d 899) and the court will not direct the People how to try its case (see Matter of Hassen v Magistrate’s Ct. of City of N. Y., 20 Misc 2d 509, 512, app dsmd 10 AD2d 908, mot for lv to app dsmd 8 NY2d 750, cert den 364 US 844; Kerstanski v Shapiro, 84 Misc 2d 1049), the District Attorney is a person who. is “presumed to act impartially in the interest only of justice” and if he does not adhere to the law, he will cast away much of his status and influence. (People v Fielding, 158 NY 542, 547.)
There are limits on the discretion of the prosecutor. In People v Siragusa (81 Misc 2d 368), the court granted an ACD after the District Attorney had withdrawn his consent because the defendant refused to release his claim for damages arising out of the subject matter against the County of Nassau. In Matter of Kurlander v Davis (103 Misc 2d 919) the court held that a City Judge acted within his power in granting an ACD notwithstanding the refusal of the District Attorney to consent when the consent of the District Attorney required the defendant to sign what amounted to a waiver of false arrest charges.
*1083 In People v White (32 NY2d 393) and in People v Blakley (34 NY2d 311), the Court of Appeals held that the District Attorney’s demand for a waiver of the right of the defendant to a speedy trial as a condition of consenting to his plea of guilty was unfair and reversed the convictions.
In People v Walker (14 NY2d 901), where the prosecution was found to be the result of the defendant’s exposure of corrupt practice in the Department of Buildings, and the prosecution was the result of an intentional discrimination to deprive the defendant of equal protection the cause was dismissed.
In Dziuma v Korvettes (61 AD2d 677), the waiver of a claim against the complainant in the criminal proceeding was held to be ineffectual as a defense to a civil action for false arrest.
The Supreme Court and lower courts have routinely inquired into the motivation underlying executive or administrative decisions in a variety of contexts. (See, e.g., Keys v School Dist. No. 1, Denver, Col., 413 US 189; Griffin v School Bd., 377 US 218; Oyler v Boles, 368 US 448; Yick Wo v Hopkins, 118 US 356; Tribe, American Constitutional Law, p 592.)[2]
An order dismissing the accusatory instrument pursuant to CPL 170.55 is a favorable termination of the proceeding (CPL 160.50, subd 2, par [b]). The file must then be sealed and fingerprints must be returned unless the People or the court move on five days’ notice that the interest of *1084 justice otherwise requires and the court states its reasons therefor on the record. (CPL 160.50, subd 1.) While the People do have the power to exercise discretion in the plea bargaining process, the systematic and consistent requirement in 226 instances out of 227 occasions or 99.56% of the time, that the defendants waive their rights to the return of fingerprints, photographs and sealing of the file, evidences a sufficient departure from prosecutorial standards as to warrant the intervention of the court.
In a related but somewhat different area, the District Attorney also demands the waiver of the return of the fingerprints upon the reduction of a plea from a misdemeanor to an infraction.
CPL 160.50 is derived from former section 79-e of the Civil Rights Law. Dwyer v Guido (54 AD2d 956) determined that where the defendant pleaded guilty to a violation count of a complaint involving printable offenses and nonprintable offenses, the fingerprints should be returned. The court there stated (p 957): “Special Term granted the petition, stating, in part: ‘This Court is unable to accept respondent’s reasoning. There was a disposition of all three charges simultaneously, and petitioner is entitled to the return of his photographs and fingerprints, the only charge of which he was convicted being a violation and not a crime.’ We agree. Only the charge of resisting arrest, a misdemeanor, permitted the police to take petitioner’s fingerprints and photographs. The dismissal of that charge was certainly a favorable and final determination in favor of petitioner. Further, appellant’s argument that the existence of the harassment conviction precluded the return of the fingerprints and photographs could lend itself to abuse. A defendant could be charged with an offense for which he could be fingerprinted and, even though the charge is ultimately reduced to an offense for which he could not be fingerprinted (e.g., a violation), it would inflict upon him the permanent scar of criminal fingerprint and photographic records.” (Emphasis supplied.)
CPL 160.50 was enacted for the purpose of returning the fingerprints and sealing the file of a person found to be *1085 without guilt as defined therein. The Governor’s Message of Approval states as follows, in part:
“The bill provides for the return of fingerprints and photos, and the sealing of arrest records in all criminal cases terminated in favor of the accused, unless another criminal action is pending, or unless the district attorney can demonstrate that the interests of justice require otherwise. The records sealed would continue to be available to the person accused, a law enforcement agency with court approval, and a gun licensing agency if the individual applies for such a license.”
“The bill also expressly provides that a criminal prosecution which does not result in a conviction shall not operate as a disqualification of any kind, and prohibits any inquiry into such prosecution, except where authorized by statute or a court.”
“In addition, the bill makes it an unlawful discriminatory practice under § 296 of the Executive Law, for any person or agency to inquire into or take adverse action in regard to a criminal prosecution which was terminated in favor of the accused, except in regard to the issuance of licenses to possess guns, or where specifically authorized by statute.”
“This legislation is consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law.” (NY Legis Ann, pp 408-409.)
Upon the termination of a proceeding by a plea of guilty to a lesser unprintable offense after an original charge of a printable offense the issue of favorable termination within the meaning of the new CPL 160.50 arose. In general, those applications granting the sealing and returning of the fingerprints proceeded on the rationale that former section 79-e of the Civil Rights Law had been to seal the file and return all fingerprints and photographs and that CPL 160.50 was not meant to diminish these rights. The rationale to the contary was that the literal words of the statute did not require sealing and return.
*1086 Included in those cases directing the return of fingerprints are: People v Hyll (90 Misc 2d 101), People v Flores (90 Misc 2d 190), People v Miller (90 Misc 2d 399), Matter of Taubenkraut v Justices & Clerk of Vil. Ct. of Vil. of Crotonon-Hudson (Supreme Ct, Westchester County, Sirignano, J.), People v Fumarelli (Town Ct, Town of Harrison, Westchester County, Fried, J.), People v Pierce (Village Ct, Village of Larchmont, Westchester County, Clifford, J.).
The contrary result was reached in People v Casella (90 Misc 2d 442), People v Blackman (90 Misc 2d 977), Matter of Vergari (Fried) (NYU, Sept. 18,1978, p 16, col 3), People v Robertson (97 Misc 2d 1026, overruled in Matter of Morgenthau v Becker, 102 Misc 2d 507), People v Garcia (Justice Ct, Town of Bedford, Westchester County, Lange, J.). (See, also, Schlicting, Rulings Vary on Returning Prints, Photos to Accused, NYU, Aug. 16, 1977, p 1, col 2.)
With rare exceptions, the District Attorney has required a plea down from a misdemeanor to a violation. In approximately three or four instances only, over the past four years, has the District Attorney withdrawn a misdemeanor charge and substituted a violation charge. By the expedient of withdrawing a misdemeanor charge and substituting a violation, the District Attorney can permit the return of the fingerprints. While a District Attorney is a quasi-judicial officer and has quasi-judicial powers, the remedies available for review of such discretion are much less than the remedies for review of the abuse of discretion of a court. The dismissal in the interest of justice section requires a statement of findings on the record (CPL 170.40). If the fingerprints are to be retained under CPL 160.50, it is incumbent upon the People to demonstrate on the record the need for same and the court must make findings accordingly (CPL 160.50, subd 1). It would appear that the District Attorney has circumvented the statutory scheme for the return of fingerprints by the use of the plea bargaining system. The effect of the prosecutor’s policy is to evade the statutory direction that the retention of fingerprints should be a matter of court, and not prosecutorial, determination.
Whether the lower courts’ granting the return of fingerprints was impermissible judicial legislation (see, e.g., *1087 Bierman v Consolidated Edison Co. of N. Y., 66 Misc 2d 237) or a frank acknowledgment that circumstances surrounding the legislation lead to a result contrary to what the rules of construction as well as the literal meaning of the statutory words might suggest (see, e.g., Matter of Country-Wide Ins. Co. v Wagoner, 45 NY2d 581), the question seems closer to resolution by the 1980 legislative enactment of CPL 160.55. (See People v Byrne, 105 Misc 2d 401.) CPL 160.55 requires the return of fingerprints and photographs and the sealing of the records of the Department of Criminal Justice Services upon the termination of a criminal action upon conviction of such person of a traffic infraction or violation unless the District Attorney upon motion, or the court on its own motion, demonstrates that the interest of justice requires otherwise and the reasons for such determination are stated on the record by the court. Court, police and prosecutor’s records are not sealed.
In Tatum v Rogers (US Dist Ct, SONY, 75 Civ 2782, Feb. 20,1979), Judge Constance Baker Motley found that New York defendants were systematically deprived of due process in violation of the Fourteenth Amendment to the United States Constitution, to the right to effective assistance of counsel as guaranteed by the Sixth Amendment, and the right to reasonable bail in violation of the Eighth Amendment whenever rap sheets containing erroneous, ambiguous or incomplete data with respect to prior arrests and dispositions were submitted to courts. The result was the frequent imposition of bail in amounts exceeding that which would be set if complete and accurate information were available to the court. Factually, 62% of rap sheets contained erroneous, incomplete or ambiguous information of prior arrests of a defendant to which they pertained. Rap sheets showed only charges, never showed formal charges, and only sporadically showed conviction charges correctly. In cases which had been sealed, for example, youthful offenders, same frequently appeared on rap sheets. Attempt offenses were designated by the particular section of the Penal Law with a notation “ATT” appearing after the designation and arrest notations of such attempts were confusingly listed in the charge column as a substantive *1088 offense itself. The District Court required that the New York State Department of Criminal Justice Services submit a feasibility study to comply with the findings of the court.
For the District Attorney to insist that the minor offender entering the criminal justice system for the first time forever surrender his prints to such a system under threat of swamping the courts with trials of minor offenses, which virtually every other District Attorney disposes of by ACD, is not in the best interest of the criminal justice system.
Nothing herein is meant to be any denigration of the accurate use of fingerprints. Fingerprinting has a vital role in identification in law enforcement and fingerprinting can well be given credit for not only bringing the guilty to justice but assuring that misidentification will not ensnare the innocent. (See Hoover, The Role of Identification in Law Enforcement: An Historial Adventure, 46 St John’s L Rev 613.) While fingerprinting is an invasion of the personality, it is one which the law recognizes and sanctions as a burden which must be borne for the good of the community (United States v Kelly, 55 F2d 67, 68.)
On the other hand, while there must be some interference with the individual, it would appear that CPL 160.50, 160.55 and 160.60 were enacted to prevent infringement of our freedom, the guarding of which is no casual matter. Traditionally, our Western values have been intertwined with a strong vein of optimism. But a most pessimistic note has been sounded.
“Throughout the postwar years, as Stephen Haseler writes, European social democracy was thought of as the political model of development that would keep Western Europe free, affluent, stable, and forever linked to the United States and the liberal system in general. For the longest while it was seen to do just that. But somewhere in the 1960s, in a manner not yet explained, the conviction faltered and the perception changed. In 1974, the quintessential social democrat Willy Brandt left office, trapped by the Soviets in an espionage coup. As he did he was reported to believe that ‘Western Europe has only twenty or thirty more years of democracy left in it; after that it will slide, engineless and rudderless, under the surrounding sea of *1089 dictatorship; whether the dictation comes from a politburo or a junta will not make that much difference.’ ” (Moynihan, Weaver, A Dangerous Place, 1978, p 229.)
A court should not sit idly by when there appears to be significant tampering with the specifics of a strongly mandated legislative scheme for returning fingerprints.
The considerations herein apply to those persons who have entered the criminal justice system for the first (and hopefully, last) time. To have such a person’s prints on file forever, to be hounded in the future on job applications, to be questioned and to have a blot on one’s record forever, is something unworthy of a democratic society. We are not considering the recidivist who has committed violent crimes, or repetitive petty offenses.
For the foregoing considerations, defendants’ motions to dismiss in the interest of justice are granted.
In view of the nature of the charges and under all the circumstances herein, the law enforcement agencies should have available for some reasonable period of time appropriate information of the defendants’ background to enable the prosecution and a court to exercise appropriate discretion on a future ACD application on any new charge against the defendants, or in a future criminal proceeding against them. Accordingly, on the court’s own motion, defendants’ fingerprints and photographs shall be returned and their respective files shall be sealed unconditionally on February 24,1983, or five years after the date of arrest. In the interim, their files shall be sealed as to all persons except as to any law enforcement agency dealing with a printable offense of the defendants for the period ending February 24,1983. The foregoing disposition strikes a reasonable balance between the rights of the defendants and the legitimate needs of the law enforcement agencies.
The defendants are herewith granted the right to avail themselves of the provisions of CPL 160.60 immediately.

. “It is probably true that ‘the most significant feature of small town politics is the frequency with which legal and procedural requirements are overlooked and ignored * * * [so as] to take account of unique conditions;’ such ‘[p]ersonalized government’ even at the local level can be as offensive as it may be intimate and effective — and at the more remote level of relations with federal, state, and other relatively distant bureaucracies and institutions, personalization in government, at least when not sought by the individual, most often seems the antithesis of respect for personal integrity and autonomy. Hence the emphasis upon ‘a government of laws, and not of men’ as the ‘very essence of civil liberty,’ and the persistent war *** against capricious subjugation to the whim of the sovereign. ‘[T]he very idea that one may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another’ has been thought ‘intolerable in any country where freedom prevails, as being the essence of slavery itself.’ The classic statement in the Supreme Court’s jurisprudence was that in Hurtado v California: 'Law is something more than mere will exerted as an act of power. It must not be a special rule for a particular person or a particular case, but * * * “the general law * * *” so that “every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society,” and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation * * * and other similar special, partial and arbitrary exertions of power under the forms of legislation. Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or an impersonal multitude.’ ” (Tribe, American Constitutional Law, pp 475-476.)